IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-250

Filed: 21 January 2020

Alamance County, No. 13 CRS 3976

STATE OF NORTH CAROLINA

v.

WILLIAM LEE SCOTT

Appeal by defendant from judgment entered 23 July 2018 by Judge Paul C. Ridgeway in Alamance County Superior Court. Heard in the Court of Appeals 15 October 2019.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kathryne E. Hathcock, for the State.*

*Franklin E. Wells, Jr., for defendant-appellant.*

TYSON, Judge.

William Lee Scott ("Defendant") appeals from a judgment entered after a jury found him guilty of second-degree murder and felony death by vehicle. The trial court arrested judgment in the felony death by vehicle and entered judgment and sentenced Defendant on the conviction for second-degree murder. We find no prejudicial error.

## I. Background

During the afternoon of 21 June 2013, Jose Munoz ("Munoz") was driving on University Drive in Elon. He observed a green Jeep vehicle pass him in a no-passing

zone at a high rate of speed. Munoz depressed his brake pedal to allow the green

Jeep "to get in [his lane] and not hit" oncoming traffic. When Munoz arrived at the

intersection of Manning Drive and University Drive, he observed the green Jeep had

collided with a 2003 white Chevrolet Impala vehicle, which had attempted to make a

left turn. Munoz also observed Defendant seated in the driver's seat of the green Jeep

with blood on his face and Veocia Warren ("Warren") apparently deceased seated

inside the white Chevrolet.

Burlington Police Officer Michael Giroux ("Lt. Giroux") was the first responder

to arrive on the scene. Giroux also serves as a part-time volunteer lieutenant with

the Elon Fire and Rescue Department. Lt. Giroux observed "an approximately

[seventy] year old black female in the driver's seat [of the white Impala vehicle] with

her face covered with blood who was unresponsive and did not appear to be

breathing."

John Cuthriell ("Cuthriell") of the Alamance County Rescue Department also

arrived on the accident scene. Cuthriell observed "significant amounts of trauma to

[Warren]." "There was blood visible and the head was essentially cocked at an angle

that [he] did not believe that the patient's condition to be sustainable of life."

Both Cuthriell and Lt. Giroux checked Warren and were unable to detect a

pulse in her carotid artery by feel or by using an oximeter. They used a heart monitor

to check for electrical activity in her heart. After they were unable to find an electrical rhythm, Warren was pronounced dead at the scene.

Warren sustained multiple abrasions and lacerations to her head, her upper body and her lower extremities, a possible broken neck, and a fracture to her left arm. Her cause of death was listed as multiple blunt force trauma.

Elon Assistant Fire Chief Charles Walker ("Asst. Chief Walker") arrived on the scene and began assisting Defendant. Asst. Chief Walker observed Defendant, while he was still restrained in the driver's seat of the green Jeep. Defendant was observed to be "in and out" of consciousness. Defendant was removed from his vehicle, placed on a backboard, and transported by ambulance to Moses Cone Hospital ("Hospital") in Greensboro.

After finishing his investigation at the accident scene, Elon Police Lieutenant Jim Giannotti ("Lt. Giannotti") went to the Hospital to speak with Defendant. Upon arrival, he was informed Defendant had already been released from the Hospital. Lt. Giannotti contacted Defendant at his girlfriend's house later that day.

Defendant was described as "really, really upset" and crying when he learned of Warren's death. Defendant stated he remembered seeing the white car as she approached his vehicle, and "the next thing [he] knew she was in front of his lane. And that [he] tried to get out of the way of it." Defendant further stated he was going "the speed limit or a little over" at the time of the crash.

Lt. Giannotti observed Defendant "didn't seem impaired" but noted "he just seemed different." In his accident report, Lt. Giannotti determined that Warren's vehicle was in Defendant's right-of-way or "in his path of travel" at the time of the collision.

## A. Blood Evidence

Investigators sought and obtained a court order for release of Defendant's medical records from the Hospital. Lt. Giannotti obtained the order from the Elon Police Department. Five days after the accident Lt. Giannotti returned to the Hospital to determine whether Defendant's blood had been drawn and tested. The Hospital confirmed that Defendant's blood was drawn shortly after his arrival in the emergency department.

In addition to the blood tests and results for the purposes of diagnosing Defendant's injuries incurred in the accident, the Hospital produced three vials of blood. The Hospital did not conduct any toxicology tests on Defendant's blood. Each vial was labeled with Defendant's name (Scott, William) and Medical Record Number: (MRN: 030043599). All three vials were closed, two of them with a red snap and one vial was closed with a purple top, to signify the vial contained an anti-coagulate, but no preservatives.

Lt. Giannotti received the three vials from the Hospital and drove them to the State Bureau of Investigation ("SBI") laboratory in Raleigh. The SBI's laboratory test

results showed Defendant's blood alcohol concentration was .22 grams of alcohol per 100 milliliters of blood.

## B. Speed Evidence

North Carolina Highway Patrol Sergeant Stephen Myers ("Sgt. Myers") was dispatched to the scene of the crash as a member of the Accident Reconstruction Unit. The posted speed limit at the intersection of University Drive and Manning Drive was forty-five miles per hour.

Sgt. Myers utilized a data retrieval tool to download information from the computer of Defendant's vehicle. The data Sgt. Myers retrieved indicated the Jeep's speed five seconds prior to the crash was seventy-eight miles per hour with a fifty-three percent accelerator pedal and a forty-seven percent engine throttle. The data also indicated that a tenth of a second before impact, Defendant's green Jeep was traveling at seventy-three miles per hour, with zero percent accelerator pedal, and the brake pedal was depressed.

Two months after the crash, Elon Police Lieutenant Kelly Blackwelder and Detective Brian Roof conducted a follow-up interview with Defendant at his home in Burlington. Defendant stated that on the day of the crash he visited several construction sites, traveled back to his house to retrieve a tool, and to a pharmacy to buy some ear drops. Defendant further stated he was "maybe going 58, maybe 60

miles per hour" at the time of the crash and that he was "not much of a speeder in general. Not even on the Interstate."

Defendant stated he had seen Warren's Impala in the roadway on Manning Avenue but noted "it happened so quickly." Defendant thought Warren had probably run a stop sign. The last thing Defendant recalled from the incident was slamming on his brakes and trying to stop his car to avoid Warren's vehicle in his lane of travel. Defendant denied consuming alcohol or medication prior to the crash.

Defendant was indicted for second-degree murder, felony death by vehicle, and misdemeanor death by vehicle on 3 September 2013. On 13 April 2018, Defendant filed a motion to suppress and memorandum of law seeking to exclude the results of the blood samples obtained from the Hospital. The same day, Defendant also filed a motion *in limine* and memorandum of law seeking to exclude the same blood evidence. Defendant's motion to suppress was heard on 6 July 2018 and denied by order on 16 July 2018. On 16 July 2018 the State dismissed the misdemeanor death by vehicle charge. Defendant's trial began 17 July 2018.

The jury's verdict found Defendant was guilty of second-degree murder and felony death by vehicle. The trial court sentenced Defendant in the mitigated range to an active term of 120-156 months and arrested judgment on the conviction for felony death by vehicle. Defendant gave written notice of appeal.

II. <u>Jurisdiction</u>

This Court possesses jurisdiction pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444(a) (2017).

### III. Issues

Defendant argues the trial court erred by denying his motion to suppress blood evidence obtained pursuant to a court order.

### IV. Motion to Dismiss

### A. Standard of Review

Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "The trial court's conclusions of law . . . are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

### B. Analysis

*1. Admission of Blood Test Results*

Defendant asserts the trial court's denial of his motion to suppress blood evidence was error. He argues the court order authorizing blood evidence to be collected and tested was insufficient under the statutes.

The trial court issued its order requiring the Hospital to release Defendant's medical records under N.C. Gen. Stat. § 8-53 (2017), which provides:

> No person, duly authorized to practice physic or surgery, shall be required to disclose any information which he may have acquired in attending a patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon, and no such information shall be considered public records under G.S. 132-1. Confidential information obtained in medical records shall be furnished only on the authorization of the patient, or if deceased, the executor, administrator, or, in the case of unadministered estates, the next of kin. Any resident or presiding judge in the district, either at the trial or prior thereto, or the Industrial Commission pursuant to law may, subject to G.S. 8-53.6, compel disclosure if in his opinion disclosure is necessary to a proper administration of justice. If the case is in district court the judge shall be a district court judge, and if the case is in superior court the judge shall be a superior court judge.

In evaluating the district court's order to release Defendant's medical records under N.C. Gen. Stat. § 8-53, we are guided by our Supreme Court's precedent in the case of *In re Superior Court Order*, 315 N.C. 378, 338 S.E.2d 307 (1986). "[T]he trial judge must be presented with something more than the complainant's bare allegation that it is the best interest of justice to allow the examination." *Id.* at 381, 338 S.E.2d 310. The movant must show by an "affidavit or similar evidence setting forth facts or circumstances sufficient to show reasonable grounds to suspect that a crime has been committed, and that the records sought are likely to bear upon the investigation of that crime." *Id.*

The officer's Application for Order contained a "bare allegation" that a fatality had occurred during a car crash. No affidavit or any evidence of a crime being committed or any indicia to raise a reasonable suspicion was included. When the order was sought, the collision had been preliminarily declared to have been caused by Warren's vehicle being in Defendant's right of way and lane of travel at the time of the collision.

In *State v. Smith*, 248 N.C. App. 804, 805 789 S.E.2d 873,874 (2016), an officer responding at the scene of a motorcycle crash had noted "the strong odor of alcoholic beverage . . . emanating from [the defendant's] breath as he was trying to speak and breathe." Another officer investigating the crash "noticed the 'very strong' odor of alcohol on [the defendant's] breath." *Id.* at 805, 789 S.E.2d at 874. At the hospital, the same investigating officer "continued to detect a strong odor of alcohol on [the defendant's] breath and observed that [the defendant] had bloodshot eyes and slurred speech." *Id.* The officer concluded "it was more probable rather than not that [the defendant had been] driving under the influence of alcohol." *Id.*

Here, no allegation or indication of Defendant's purported intoxication was asserted in the record or in the Application for Order. None of the officers, firefighters, or paramedics on the scene, nurses, physicians, or investigating officers in close and direct contact with Defendant at the hospital noticed any signs of impairment at the time of the collision or thereafter.

The first and only indication of Defendant's intoxication were results of tests on Defendant's blood samples taken from the Hospital and tested over a week later at the SBI laboratory. The trial court's order on Defendant's motion to suppress specifically found "the affidavit and order entered in this case on June 26, 2013 would fail" under N.C. Gen. Stat. § 8-53, but denied Defendant's motion to suppress and admitted the results of the blood tests under N.C. Gen. Stat. § 90-21.

We agree the trial court's order cannot be sustained under N.C. Gen. Stat. § 8-53, but this does not end our analysis of the order. This Court has held a "trial court's ruling must be upheld if it is correct upon any theory of law, and thus it should not be set aside merely because the court gives a wrong or insufficient reason for it." *State v. Turner*, 239 N.C. App. 450, 455, 768 S.E.2d 356, 359 (2015). N.C. Gen. Stat. § 90-21.20B may provide a statutory method for a "judicial official" to order the disclosure of private health information in the event of a vehicle crash. *See Smith*, 248 N.C. App. at 814-15, 789 S.E.2d at 879-80.

N.C. Gen. Stat. § 90-21.20B(a1) (2017) provides:

> Notwithstanding any other provision of law, if a person is involved in a vehicle crash:
>
> > (1) Any health care provider who is providing medical treatment to the person shall, upon request, disclose to any law enforcement officer investigating the crash the following information about the person: name, current location, and whether the person appears to be impaired by alcohol, drugs, or another substance.

> (2) Law enforcement officers shall be provided access to visit and interview the person upon request, except when the health care provider requests temporary privacy for medical reasons.
>
> (3) A health care provider shall disclose a certified copy of all identifiable health information related to that person as specified in a search warrant or an order issued by a judicial official.

The State asserts the trial court's ruling on Defendant's motion to suppress was proper under this statute. It argues Defendant's blood was drawn in the regular course of medical treatment after arrival in the Hospital's emergency department with injuries from a motor vehicle crash. The samples were not drawn at the request or suggestion of a law enforcement officer or in connection with any pending investigation. The Hospital conducted routine blood draws upon Defendant's arrival in the emergency department to diagnose his condition for medical treatment.

Application of the car crash provisions of this statute falls outside of the statutes at issue and reviewed in *Mitchell v. Wisconsin*, __ U.S. __, __ n.1, 204 L. Ed. 2d 1040, 1044 n.1 (2019). ("Wisconsin also authorized BAC testing of drivers involved in accidents that cause significant bodily harm, with or without probable cause of drunk driving. We do not address those provisions." (citation omitted)). The Supreme Court of the United States' plurality opinion in *Mitchell* does not support the State's argument.

In addition, the trial court's order does not base its reasoning upon exigent circumstances to draw blood without a warrant from an incapacitated person, who is under suspicion for drunk driving. "[T]he natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *State v. Romano*, 369 N.C. 678, 687, 800 S.E.2d 644, 656 (2017) (quoting *Missouri v. McNeely*, 569 U.S. 141, 165, 185 L. Ed. 2d 696, 715 (2013)).

The State's reliance on *State v. Smith* is also inapposite. The facts in *Smith* involved a search warrant for the defendant's test results and did not involve whether the search warrant was supported by sufficient probable cause. *Smith*, 248 N.C. App. at 815, 789 S.E.2d at 879. This Court concluded the "identifiable health information" in § 90-21.2-B(a1)(3) requires a search warrant or judicial order that "specifies the information sought." *Id.*

However, a valid order remains subject to the reasonable suspicion standard required by our Supreme Court's opinion in *In re Superior Court Order*, 315 N.C. at 382, 338 S.E.2d at 307. A search warrant remains subject to the probable cause standard contained in N.C. Gen. Stat. § 15A-244 (2017). As noted above, the order before us is not based upon either reasonable suspicion or probable cause.

Under N.C. Gen. Stat. § 8-53, the only evidence tending to show Defendant was impaired by intoxication was the results of Defendant's blood draws, which were

conducted at the SBI laboratory more than a week after the blood had been drawn at the Hospital. Defendant's motion to suppress should have been sustained and the blood test results should have been excluded. Defendant's second-degree murder conviction cannot be supported on a theory of intoxication to provide the required element of malice. Because we reach this conclusion that the admission of the test results of Defendant's blood was error, we do not need to address Defendant's remaining arguments related to the denial of the motion to suppress the results of the blood evidence.

### 2. *Speeding and Reckless Driving as Malice*

The trial court also instructed the jury on two other grounds from which it could find the requisite malice to support a conviction for second-degree murder:

> b. The laws of this State make it unlawful to drive in excess of the posted speed limit. To establish that the Defendant drove in excess of the posted speed limit, the State must prove the following two things beyond a reasonable doubt.
>
>> i. A speed limit was lawfully posted by appropriate signs erected by proper authorities giving motorists notice of the speed limit on University Drive giving motorists notice of the speed limit; and
>>
>> ii. that the defendant drove a vehicle on this portion of the highway at a speed exceeding the posted speed limit.
>
> c. The laws of this State make it unlawful to drive recklessly. To establish that the Defendant drove recklessly, the State must prove the following two things

beyond a reasonable doubt.

> i. That the defendant drove a vehicle upon a street or highway; and

> ii. That he drove that vehicle in disregard of posted speed limits and marked no passing lanes and that in doing so he acted carelessly and heedlessly in willful or wanton disregard of the rights or safety of others.

This instruction followed the pattern jury instruction. *See* N.C.P.I. -- Crim. 206.32A (2010). The jury was instructed on two additional and distinct theories of Defendant's unlawful conduct to support a finding of malice, for second-degree murder, in addition to Defendant's intoxication.

### a. Eyewitness and Officers' Testimony

The State presented the testimony of Munoz, who had observed Defendant's green Jeep pass him at a high rate of speed in a no-passing zone immediately prior to the collision. Munoz testified he had to slow his vehicle down to allow Defendant's green Jeep back into the lane and avoid a collision. He continued driving to the scene and personally observed that the green Jeep had collided with the white Chevrolet.

The State also provided the testimony of Sgt. Myers, who had examined Defendant's vehicle's computer. This data tended to show Defendant's vehicle was traveling seventy-eight miles per hour five seconds prior to the crash and was traveling seventy-three miles per hour near the point of impact, while in a forty-five mile per hour speed zone.

Because the jury returned a general verdict form that did not specify the specific ground to support malice, and Defendant did not object to this testimony nor challenge any of the jury instructions to support the element of malice, evidence of these other two theories support Defendant's conviction for second-degree murder. Contrary to the assertion in our colleague's dissent, Defendant has not argued and cannot show any error on the blood test results of intoxication is prejudicial under either of these grounds to warrant a new trial.

### b. Rule 404(B) Evidence

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2017) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

The trial court admitted, over Defendant's objection, a certified copy of Defendant's three judgments and convictions for driving while impaired, two instances of speeding, driving while license revoked, and no operator's license. The State argues the evidence of Defendant's prior traffic offenses is properly admitted under Rule 404(b) and shows his intent, knowledge, or absence of mistake to support malice as an essential element of second-degree murder. We agree.

"[P]rior driving convictions of a defendant are admissible to show malice, and the showing of malice in a second-degree murder case is a proper purpose within the

meaning of Rule 404(b)." *State v. Goodman*, 149 N.C. App. 57, 72, 560 S.E.2d 196, 206 (2002) (Greene, J., dissenting), *rev'd per curiam per the dissent*, 357 N.C. 43, 577 S.E.2d 619 (2003). Defendant's argument is without merit and is overruled.

## V. Conclusion

The admission of the later SBI laboratory alcohol test results of Defendant's blood, which was drawn a week earlier at the Hospital immediately following the accident, was erroneous under either statute. The State provided substantial evidence of both Defendant's high speed and his reckless driving, together with his prior record, to show malice to support Defendant's conviction for second-degree murder.

Defendant has failed to carry his burden to show any prejudicial error in the denial of the motion to suppress. Defendant received a fair trial, free from prejudicial errors he preserved and argued. We find no prejudicial error in the jury's verdict or in the judgment entered thereon. *It is so ordered.*

NO PREJUDICIAL ERROR.

Judge BRYANT concurs in the result.

Judge BROOK concurs in part and dissents in part with separate opinion.

BROOK, Judge, concurring in part and dissenting in part.

I join the portion of the lead opinion holding that neither of the orders entered by the district court or superior court allowing the State to obtain and introduce evidence that Defendant was impaired at the time his vehicle collided with Ms. Warren's were based on evidence showing reasonable suspicion that Defendant had committed any crime. I therefore concur in the holding that Defendant's motion to suppress this evidence should have been granted. However, I respectfully dissent from the portion of the lead opinion holding that admission of this evidence in violation of Defendant's Fourth Amendment rights did not constitute prejudicial error. This error was not harmless beyond a reasonable doubt. Defendant is therefore entitled to a new trial.

## I. Fourth Amendment Violation

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The U.S. Supreme Court has observed:

> [t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

*Schmerber v. Cal.*, 384 U.S. 757, 769-70, 86 S. Ct. 1826, 1835, 16 L. Ed.2d 908 (1966). "The Amendment thus prohibits 'unreasonable searches,' . . . [and] the taking of a

blood sample . . . is a search." *Birchfield v. North Dakota*, ___ U.S. ___, ___, 136 S. Ct. 2160, 2173, 195 L. Ed.2d 560 (2016). *See also State v. Romano*, 369 N.C. 678, 685, 800 S.E.2d 644, 649 (2017) ("drawing blood . . . constitutes a search under both the Federal and North Carolina Constitutions"). "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady v. North Carolina*, 575 U.S. 306, 310, 135 S. Ct. 1368, 1371, 191 L. Ed.2d 459 (2015) (per curiam). Blood tests, in particular, (1) "require piercing the skin and extract a part of the subject's body"; (2) are "significantly more intrusive than blowing into a tube"; and (3) "place[] in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading." *Birchfield*, ___ U.S. at ___, 136 S. Ct. at 2178 (internal marks and citation omitted).

As a general matter, the Fourth Amendment requires the issuance of a warrant supported by probable cause to effectuate a search and seizure. *Terry v. Ohio*, 392 U.S. 1, 20-22, 88 S. Ct. 1868, 1879-80, 20 L. Ed.2d 889 (1968). There are exceptions to this requirement, however. For instance, law enforcement may effectuate a brief investigatory seizure of a person to search for weapons if based upon reasonable suspicion. *Id.* at 27, 88 S. Ct. at 1883. As this Court has observed,

> [r]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less

2

> than preponderance of the evidence. The standard is satisfied by some minimal level of objective justification. A court must consider 'the totality of the circumstances—the whole picture' in determining whether a reasonable suspicion to make an investigatory stop exists. When a defendant in a criminal prosecution makes a motion to suppress evidence obtained by means of a warrantless search, the State has the burden of showing, at the suppression hearing, how the warrantless search was exempted from the general constitutional demand for a warrant.

*State v. Smathers*, 232 N.C. App. 120, 123, 753 S.E.2d 380, 382-83 (2014) (internal marks and citation omitted). "The reasonable suspicion" that serves as the basis for the investigatory search and seizure "must arise from the officer's knowledge prior to the time of the stop." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

In *In re Superior Court Order*, 315 N.C. 378, 381, 338 S.E.2d 307, 310 (1986), our Supreme Court held that the State was required to make a showing of reasonable suspicion before the production of certain bank records could be compelled. The records in question were potential evidence of a crime but at the time they were sought the matter was in an investigatory stage and no charges had been filed. *Id.* at 379-80, 338 S.E.2d at 308-09. Rejecting the argument that, in the absence of an authorizing statute, the trial court lacked the authority to order the production of the records, the Supreme Court held that trial courts are invested with inherent authority to order potential evidence to be produced during investigations, including the bank records in question. *Id.* at 380, 338 S.E.2d at 309. The Supreme Court

cautioned, however, that this inherent authority is still subject to constitutional limits; that is, the State still must present "an affidavit or similar evidence setting forth facts or circumstances sufficient to show reasonable grounds to suspect that a crime has been committed, and that the records sought are likely to bear upon the investigation of that crime." *Id.* at 381, 338 S.E.2d at 310. "With this evidence before it," the Supreme Court explained, "the trial court can make an independent decision as to whether the interests of justice require the issuance of an order rather than relying solely upon the opinion of the prosecuting attorney." *Id.*

In the present case, the superior court's order denying Defendant's motion to suppress misstated that the motion to obtain the blood collected from Defendant during his treatment at the hospital, styled an "Application for Order for Moses Cone Hospital Medical Records," contained a bare allegation by the officer investigating the death of Ms. Warren "that a fatality had occurred during a car crash." This allegation was made by an assistant district attorney tasked with prosecuting the case, not an officer investigating Ms. Warren's death. That is what the Supreme Court held was improper in *In re Superior Court Order*; the superior court's reliance on the prosecutor's allegation in the motion is precisely the "sole[] [reliance] upon the opinion of the prosecuting attorney" that the Supreme Court rejected in *In re Superior Court Order*. 315 N.C. at 381, 338 S.E.2d at 310. Likewise, "[r]elying solely upon the opinion of the prosecuting attorney," the district court was unable to "make an

4

independent decision as to whether the interests of justice require[d] the issuance of [the] order[.]" *Id.* Furthermore, as the superior court noted in the order denying the motion to suppress, "the [motion] and order simply recite the bare allegations that Defendant was involved in an automobile accident; that the other driver was killed; that Defendant was treated and released at the hospital; and that 'due to the motor vehicle accident resulting in the death of another, and in order to complete the investigation and to determine if [Defendant] was impaired, the Elon Police Department is in need of all medical records from Moses Cone Hospital for [Defendant][.]'"

In short, at the time the State sought the order compelling the hospital to produce Defendant's blood, the allegation in the June 2013 motion that a fatality had occurred during a car crash was not supported by any evidence. There is no record affidavit or testimony by a witness with knowledge of the circumstances surrounding the wreck or investigation of Ms. Warren's death pre-dating the district court's June 2013 order that could have constituted reasonable suspicion to support entry of this order. Nor is there any indication that the district court considered any evidence beyond that in the record before our Court when it ordered the hospital to produce Defendant's blood in June 2013. The superior court acknowledged as much in denying the motion to suppress based on the incorrect legal standard, conceding that "[i]f measured against [the] principle [that the equivalent of reasonable suspicion is

required], the . . . order entered in this case on June 26, 2013 would fail[.][1] The orders allowing the State to obtain and introduce evidence that Defendant was impaired at the time his vehicle collided with Ms. Warren's were therefore erroneous.

## II. Remedy for Constitutional Violation

Having concluded that Defendant's Fourth Amendment rights were violated by compelling the production of his blood from the hospital without a warrant and in the absence of any evidence establishing reasonable suspicion that he committed any crime, I turn to whether this error, and the subsequent introduction at trial of evidence obtained from analysis of Defendant's blood by personnel at the State Bureau of Investigation ("SBI") laboratory, requires that the judgment entered upon the jury's verdict be vacated, necessitating a new trial. I conclude that the judgment must be vacated, and a new trial is required.

---

[1] The superior court concluded that the required showing under N.C. Gen. Stat. § 90-21.20B(a1), which the court believed provided the governing standard, was merely "of (a) the fact that an automobile accident occurred and (b) that specified individual health information exists that is relevant thereto," a lower standard than reasonable suspicion. However, the unsupported allegations of the prosecutor in June 2013 did not even meet this standard; these allegations did not constitute evidence "of (a) the fact that an automobile accident occurred and (b) that specified individual health information exists that is relevant thereto" because they were not verified by the prosecutor or a witness, nor was a supporting affidavit attached to the motion as an exhibit. *See, e.g.*, *State v. Simmons*, 205 N.C. App. 509, 523-25, 698 S.E.2d 95, 105-06 (2010) (evidence establishing reasonable suspicion may be supported by affidavit but is not limited to affidavit and may also include testimony). There is no record testimony pre-dating the district court order compelling production of the blood supporting the allegations in the motion either. When "the government coerces, dominates, or directs the action of a private person, a resulting search and seizure may violate the guarantees of the Fourth Amendment." *State v. Hauser*, 115 N.C. App. 431, 436, 445 S.E.2d 73, 78 (1994) (citation omitted). The warrantless compelled production of records under N.C. Gen. Stat. § 90-21.20B(a1) by a private party, such as a hospital, must be supported by reasonable suspicion. *See In re Superior Court Order*, 315 N.C. at 381, 338 S.E.2d at 310.

"Fourth Amendment rights are enforced primarily through the 'exclusionary rule,' which provides that evidence derived from an unconstitutional search or seizure is generally inadmissible in a criminal prosecution of the individual subjected to the constitutional violation." *State v. McKinney*, 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006) (citation omitted). "The 'fruit of the poisonous tree doctrine,' a specific application of the exclusionary rule, provides that '[w]hen evidence is obtained as the result of illegal police conduct, not only should that evidence be suppressed, but all evidence that is the "fruit" of that unlawful conduct should be suppressed.'" *Id.* (quoting *State v. Pope*, 333 N.C. 106, 113-14, 423 S.E.2d 740, 744 (1992)). Although preserved errors not of constitutional dimension are reviewed for whether "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial," *State v. Wiggins*, 334 N.C. 18, 27, 431 S.E.2d 755, 760 (1993) (citation omitted), "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," *State v. Lawrence*, 365 N.C. 506, 513, 723 S.E.2d 326, 331 (2012) (internal marks and citation omitted).

Defendant argues he "was prejudiced by the trial court's denial of his motion to suppress the blood evidence[;]" a review of the facts reveals that admission of evidence obtained in violation of the Fourth Amendment was not harmless beyond a reasonable doubt here. The State's theory of the case was predicated upon the blood

evidence of Defendant's impairment establishing the malice element required to convict Defendant of second-degree murder. Indeed, the State dismissed the misdemeanor death by vehicle charge and proceeded to trial on second-degree murder by vehicle and felony death by vehicle alone once the trial court denied Defendant's motion to suppress. In discussing the admissibility of the blood evidence, the superior court stressed its centrality to the State's case: "I'm not sure what the evidence of impairment is. You know, there will be a motion to dismiss at the end of the State's case. And as I understand the case, it rises or falls on the blood evidence." As the trial court predicted and the majority of this Court agrees, "[t]he first and only indication of Defendant's intoxication were results of tests on Defendant's blood samples taken from the Hospital and tested over a week later at the SBI laboratory." *State v. Scott*, *supra* at ___. And, most importantly, none of the witnesses testifying at trial who came into contact with Defendant after his vehicle collided with Ms. Warren's vehicle noticed the odor of alcohol on or about his person, nor did any notice Defendant slur his speech or exhibit other signs of impairment. As Officer Giannotti confirmed on cross-examination, as of 21 June 2013, the day of the wreck, he had seen no evidence that Defendant was impaired. Officer Giannotti testified further that he never requested that Defendant submit to any alcohol testing because "there was nothing that gave rise to a belief that [Defendant] was impaired[.]"

*BROOK, J., concurring in part and dissenting in part*

The opinion of the Court suggests that the introduction of the blood evidence and results of testing performed on the blood did not constitute prejudicial error because there was other evidence – namely, Defendant's prior convictions for impaired driving and speeding and evidence that Defendant was speeding on the day of the collision with Ms. Warren – from which the jury could have concluded that the showing of malice required for a conviction of second-degree murder by motor vehicle had been met. This suggestion seems to be based on a misapplication of the applicable legal standard, however. The standard is whether we can "declare a belief that [the federal constitutional error] was harmless beyond a reasonable doubt." *Lawrence*, 365 N.C. at 513, 723 S.E.2d at 331 (citation omitted). Although it is true that evidence was introduced at trial that Defendant was speeding on the day of the wreck and had prior speeding and impaired driving convictions, I cannot say with any confidence that the erroneous admission of blood evidence here – evidence the superior court observed at the outset of trial the case "rises and falls on" – did not prejudice Defendant, much less can I so state beyond a reasonable doubt. *See id.*